IN RE CHRISTUS SANTA ROSA
HEALTH SYSTEM, d/b/a Christus
Santa Rosa Hospital–New Braunfels,
Relator

NO. 14–1077

Supreme Court of Texas.

Argued December 9, 2015

OPINION DELIVERED: May 27, 2016

Diana L. Faust, Kyle M. Burke, R. Brent Cooper, Cooper & Scully, P.C., Austin Richard John Kasson, Gonzales, Chiscano, Angulo & Kasson, PC, San Antonio, for Real Parties in Interest.

Edward John Kroger, Leah Ann Greene, Meredith Massey, Kroger/Burrus, Houston, for Relators.

Justice GREEN delivered the opinion of the Court.

In this mandamus proceeding, Christus Santa Rosa Health System (Christus) challenges the trial court's order compelling production of its medical peer review committee's records pertaining to a surgery performed by Dr. Gerald Marcus Franklin. Christus contends that the documents are protected from production by the medical peer review committee privilege, provided in section 160.007(a) of the Texas Occupations Code, and that the trial court abused its discretion in ordering Christus to pro-

duce the documents to Dr. Franklin. Dr. Franklin contends that the documents are subject to disclosure under the exception to the medical peer review committee privilege provided in section 160.007(d). We hold that the trial court abused its discretion in ordering the documents produced without a proper in camera inspection to determine whether the exception in section 160.007(d) applies. Accordingly, we conditionally grant mandamus relief and direct the trial court to inspect the documents at issue to determine whether Dr. Franklin is entitled to the medical peer review committee documents pursuant to section 160.007(d).

## I. Facts and Procedural History

The relevant facts are undisputed. In March 2012, Dr. Franklin performed surgery on Leslie Baird to remove the left lobe of her thyroid.[1] Originally, Dr. Franklin was going to remove only a sample of tissue from the left lobe so he could have it diagnosed during surgery using a cryostat machine. Once diagnosed, he would remove the rest of the lobe if necessary. The surgery was unsuccessful, however, because Dr. Franklin removed thymus gland tissue instead of thyroid tissue. As a result, Baird needed to undergo a second surgery to remove the left lobe of her thyroid.[2] After the failed surgery, Christus convened a medical peer review committee to review Dr. Franklin's performance in the surgery. Ultimately, the

committee did not recommend discipline or any other action.

In March 2013, Baird filed suit against Dr. Franklin and his medical group for medical malpractice as a result of the failed surgery. Soon after, Dr. Franklin filed a motion to designate Christus as a responsible third party, alleging that Christus was responsible for the surgery's failure because it had failed to inform him that the cryostat machine, a critical piece of equipment, was unavailable. Dr. Franklin argued that he needed a cryostat machine to diagnose the removed tissue intraoperatively. Because the machine was unavailable, Dr. Franklin contends, he could not complete the surgery and had to end the operation without removing the left lobe of Baird's thyroid. Baird named Christus as a defendant.

On March 7, 2014, Dr. Franklin served his first request for production on Christus, asking for, among other things, documents from Christus's medical peer review file. Christus timely served responses and objections and filed a motion for protective order and a privilege log listing all of the documents withheld based on an assertion of privilege. Christus argued that it was not required to produce the requested documents because those documents were privileged under the medical peer review committee privilege. *See* TEX. OCC. CODE § 160.007(a). After Dr. Franklin filed a motion to compel, Christus sent the documents listed in the privilege log to the trial court for an in camera inspection.[3]

---

1. Baird had already undergone surgery to remove the right lobe of her thyroid, which was cancerous. Dr. Franklin was removing the left lobe to determine whether it also contained cancer.

2. Baird used a different doctor to finally remove the left lobe, which was negative for cancer.

3. We received several sealed documents as part of the record in this case. Those documents, however, are largely irrelevant to the issue before us and do not include the peer review documents at issue in this case. While a peer review case review form was included, it was for a different patient than Baird. We note, therefore, that we have not reviewed the documents at issue in this case and do not base our opinion on their contents.

After a hearing, the trial court ordered Christus to produce the documents to Dr. Franklin under a protective order, requiring that the documents remain confidential.[4] The protective order mandated that the documents be disclosed only to Dr. Franklin and his attorney and not disseminated to any other parties. Christus then filed a motion to reconsider, but the motion was denied.[5]

Christus filed a petition for writ of mandamus in the court of appeals, which was also denied. 487 S.W.3d 599, 600 (Tex. App.–Austin 2014) (mem.op.). Christus subsequently filed a petition for writ of mandamus in this Court.

## II. Standard of Review

■ "Mandamus relief is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal." *In re Frank Kent Motor Co.*, 361 S.W.3d 628, 630 (Tex.2012). "A trial court clearly abuses its discretion if 'it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (quoting *Johnson v. Fourth Ct. App.*, 700 S.W.2d 916, 917 (Tex.1985)). Furthermore, the trial court abuses its discretion when it fails to adequately inspect documents tendered for an in camera inspection before compelling production "when such review is critical to the evaluation of a privilege claim." *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 261 (Tex.2005).

■ We have long held that "a party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery

error." *Walker*, 827 S.W.2d at 843. If the trial court issues an erroneous order requiring the production of privileged documents, the party claiming the privilege is left without an adequate appellate remedy. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 697–98 (Tex.2015); *In re Living Ctrs.*, 175 S.W.3d at 256; *Mem'l Hosp.—The Woodlands v. McCown*, 927 S.W.2d 1, 12 (Tex.1996); *Walker*, 827 S.W.2d at 843. If the documents at issue are alleged to be privileged, "mandamus is appropriate if we conclude that they are privileged and have been improperly ordered disclosed." *In re Living Ctrs.*, 175 S.W.3d at 256.

## III. Medical Peer Review Committee Privilege

■ Christus argues that the trial court abused its discretion when it erroneously ordered production of documents protected from discovery by the medical peer review committee privilege. *See* TEX. OCC. CODE § 160.007(a). "Pleading and producing evidence establishing the existence of a privilege is the burden of the party seeking to avoid discovery. The party asserting the privilege must establish by testimony or affidavit a prima facie case for the privilege." *In re Mem'l Hermann Hosp.*, 464 S.W.3d at 698 (internal citations omitted). If the party asserting the privilege establishes a prima facie case for the privilege and "tenders documents to the trial court, the trial court must conduct an in camera inspection of those documents before deciding to compel production." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex.2004) (per curiam). Once the party claiming privilege presents a prima facie case that the

---

**4.** Because the trial court judge named as respondent in this proceeding was in trial, another trial court judge heard Dr. Franklin's motion to compel and ruled on the motion.

**5.** The trial court judge named as respondent in this proceeding heard that motion and issued the order challenged in this case.

documents are privileged, the burden shifts to the party seeking production to prove that an exception to the privilege applies. *See Granada Corp. v. Hon. First Ct.App.*, 844 S.W.2d 223, 227–28 (Tex.1992) (recognizing that the crime—fraud exception to the attorney—client privilege applies only if a prima facie case of contemplated fraud is made by the party seeking discovery); *In re Park Cities Bank*, 409 S.W.3d 859, 868–69 (Tex.App.-Tyler 2013, orig. proceeding) ("Once the party resisting discovery establishes a prima facie case that the documents are privileged, the burden shifts to the discovering party to refute the privilege claim."); *In re Small*, 346 S.W.3d 657, 662–63 (Tex.App.-El Paso 2009, orig. proceeding) (same); *Coats v. Ruiz*, 198 S.W.3d 863, 876 (Tex.App.-Dallas 2006, no pet.) (explaining that "[t]he party claiming the exception to the privilege bears the burden of establishing a prima facie case" that an exception applies); *In re AEP Tex. Cent. Co.*, 128 S.W.3d 687, 692 (Tex.App.-San Antonio 2003, orig. proceeding) (same). Because the documents at issue are alleged to be privileged, we first consider whether the party asserting the privilege presented a prima facie case for privilege; if so, we then consider whether the party seeking discovery has met its burden to prove that an exception to the privilege applies. *See In re Mem'l Hermann Hosp.*, 464 S.W.3d at 698; *Granada Corp.*, 844 S.W.2d at 227.

Whether a discovery privilege applies is a matter of statutory construction. *See In re Mem'l Hermann Hosp.*, 464 S.W.3d at 700–01 (using the rules of statutory construction to determine whether the anticompetitive action exception to the medical peer review privilege applied). Privileges are disfavored in the law because they "contravene the fundamental principle that the public ... has a right to every man's evidence," and should, there-

fore, be strictly construed. *Jordan v. Ct. App. for the Fourth Sup. Jud. Dist.*, 701 S.W.2d 644, 647 (Tex.1985) (omission in original) (internal quotations omitted). "Statutory construction is a question of law we review de novo." *In re Mem'l Hermann Hosp.*, 464 S.W.3d at 700. When construing a statute, we look to the plain language to determine the intent of the Legislature. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006). If the statute is unambiguous, we apply the words according to their common meaning, but we may consider the objective of the law and the consequences of a particular construction. *Id.*

In section 160.007 of the Texas Occupations Code, the Legislature provided a privilege for records made by a medical peer review committee in the course of its review. TEX. OCC. CODE § 160.007(a). Under section 160.007(a), "each proceeding of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged." *Id.* The Occupations Code defines "medical peer review committee" as "a committee of a health care entity ... that operates under written bylaws approved by the policy-making body ... and is authorized to evaluate the quality of medical and health care services or the competence of physicians." *Id.* § 151.002(a)(8). Such a committee engages in "medical peer review" when it evaluates "medical and health care services, including evaluation of the qualifications and professional conduct of professional health care practitioners and of patient care provided by those practitioners." *Id.* § 151.002(a)(7). The parties do not dispute that Christus's committee satisfies these definitions.

In *Irving Healthcare System v. Brooks*, we recognized that "[t]he overarching purpose of the [medical peer review committee privilege] is to foster a free, frank

exchange among medical professionals about the professional competence of their peers." 927 S.W.2d 12, 17 (Tex.1996). This results in higher standards of medical care because an atmosphere of confidentiality allows for candid and uninhibited communication about the performance of physicians. *McCown,* 927 S.W.2d at 3. The medical peer review privilege protects "an evaluative process, not mere records." *In re Living Ctrs.,* 175 S.W.3d at 258.

The Legislature has established several limited exceptions to the medical peer review privilege. *See* TEX. OCC. CODE § 160.007. Texas Occupations Code section 160.007(d) provides the exception relevant to this case:

> If a medical peer review committee takes action that could result in censure, suspension, restriction, limitation, revocation, or denial of membership or privileges in a health care entity, the affected physician shall be provided a written copy of the recommendation of the medical peer review committee and a copy of the final decision, including a statement of the basis for the decision.

*Id.* § 160.007(d). However, disclosure of the recommendation and decision to the affected physician under this exception "does not constitute waiver of the confidentiality requirements" established under the statute. *Id.*

In presenting its prima facie case for privilege, Christus filed an affidavit from the director of quality and patient safety, the Medical Staff Bylaws (the Bylaws), and a privilege log.[6] Christus submitted the allegedly privileged documents to the trial court for in camera review. Dr. Franklin does not contend that Christus failed to establish the applicability of the medical peer review privilege; he argues only that the exception in section 160.007(d) applies. Because Christus presented a prima facie case for the privilege and tendered the allegedly privileged documents to the trial court, the trial court was obligated to review them before compelling production. *In re Mem'l Hermann Hosp.,* 464 S.W.3d at 698; *In re E.I. DuPont de Nemours,* 136 S.W.3d at 223. We note at the outset that the trial court judge named as respondent in this case did not hear Dr. Franklin's motion to compel because he was in trial and unavailable. As a result, another judge heard counsels' arguments on the motion to compel and ordered that the documents be produced. The transcript of the hearing on Christus's motion to reconsider, which was heard by the respondent judge, indicates that the substitute judge likely did not have the affidavits presented by Christus and did not review any of the documents tendered by Christus for in camera inspection before compelling production.[7]

Regardless, the trial court had the opportunity to correct this error when hearing Christus's motion to reconsider. *See In re C.O.S.,* 988 S.W.2d 760, 765 (Tex. 1999) ("In a civil case, judicial economy generally requires that a trial court have an opportunity to correct an error before an appeal proceeds."); *cf. In re Blevins,* 480 S.W.3d 542, 543 (Tex.2013) (per curiam) ("[G]enerally a writ will not issue against one judge for what another did.").

---

6. While the record references two affidavits filed in support of Christus's claim of medical peer review committee privilege, only one affidavit was included in the record filed in this Court.

7. Christus's counsel stated during the hearing: "[Substitute Judge] did not have the benefit of the sealed documents. We submitted them directly to [Trial Court]. He also didn't have the benefit of the two affidavits that established the peer-review privilege that protects the final peer-review report from discovery."

In its motion to reconsider, Christus expressed its belief that an in camera inspection of the peer review documents would clarify whether the section 160.007(d) exception to the medical peer review committee privilege applies. At the hearing on that motion, the trial court referred to a stack of papers "probably four inches thick" submitted for in camera inspection. The trial court explained that he "went through the.... documents page by page," but that he reviewed the documents only to "cull back ... information regarding other people's ... health information and/or [s]ocial [s]ecurity numbers." The trial court did not "think [he] saw the affidavits" and "didn't look at the [peer review] report for the merits of it one way or the other."

In *In re Living Centers of Texas*, we granted mandamus relief when the trial court failed to conduct a proper review of documents submitted for in camera inspection before compelling production. 175 S.W.3d at 261–62. There, the trial court used "only superficial indicators to deny Living Center's privilege claim." *Id.* at 262. Here, the trial court reviewed the documents only to prevent "other people's ... health information and/or [s]ocial [s]ecurity numbers" from being disclosed. The trial court even stated that he "didn't look at [the documents] closely enough" to determine whether the medical peer review committee took any action that could result in disciplinary action—the standard for applicability of the section 160.007(d) exception—because "[t]hat wasn't the reason [he] was looking at it." In fact, when the trial court put several documents into a manila folder to remain sealed, he was unsure whether the final peer review report was included in those documents.[8] Mandamus relief is appropriate when a trial court "fails to conduct an adequate *in camera* inspection of documents when such review is critical to evaluation of a privilege claim." *Id.* at 261 (italics in original); *see In re E.I. DuPont de Nemours,* 136 S.W.3d at 223 ("The trial court abuses its discretion in refusing to conduct an in camera inspection when such review is critical to the evaluation of a privilege claim.").

To determine whether in camera inspection is critical to the evaluation of the medical peer review committee privilege claim in this case, we must consider the parties' arguments about the meaning of section 160.007(d) in this context. Dr. Franklin argues that because Christus's medical peer review committee had the opportunity to recommend discipline—even though it did not—the committee took an action that could have resulted in one of the disciplinary measures listed in the statute. Under Dr. Franklin's interpretation, a medical peer review committee would "take action" whenever it convenes to review the quality of medical care or competence of a physician because it has the ability to recommend disciplinary action. We disagree.

Looking to the intent of the Legislature, as we must, we conclude that the Legislature intended a medical peer

8. The hearing transcript reflects the following exchange:

Trial Court: "[T]he motion for protection is overruled with the exception of the documents that I put in a separate manila envelope and taped up and ... wrote that they remain sealed...."

Christus's Counsel: "Can we get the Bates numbers of those pages?"

Trial Court: "Oh, I don't know. I just—I mean, they're on there. We would have to open it up to see."

Christus's Counsel: "Does it include—can we agree it includes the final peer-review report?"

Trial Court: "I don't know. To be honest with you, I don't know."

review committee do more than simply convene for review for the exception to apply. We note that section 160.007(d) provides for disclosure only of the "recommendation" and "final decision" of the medical peer review committee, which connotes a completion of review, more than simply convening a meeting. Additionally, we must give effect to the Legislature's choice of words: "takes action that could result in" discipline. We presume that the Legislature "deliberately and purposefully selects [the] words and phrases it enacts." *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex.2012). According to Webster's International Dictionary, "take" means "to undertake and make (as a movement) or do or perform (as an act or an action)," and "action" refers to "a voluntary act of will that manifests itself externally." *Take, Action*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2330, 21 (2002). "Result" means "to proceed, spring, or arise as a consequence, effect, or conclusion." *Result*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1937 (2002). Therefore, some consequence—the disciplinary measures listed in the statute—must be possible from the medical peer review committee's voluntary act of will.

If the Legislature wanted to provide for peer review document disclosure to a physician every time a medical peer review committee reviews the physician's actions, then it could have done so. *See R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 568 (Tex.2016) ("Had the Legislature intended to place an objective limitation on the term in contravention of its ordinary meaning, it could have done so."). In fact, that is exactly what it did in section 160.007(c), which allows certain documents from the medical peer review committee to be disclosed to: "(1) another medical peer review committee; (2) an appropriate state or federal agency; (3) a national accreditation body;

(4) the [Texas Medical B]oard; or (5) the state board of registration or licensing of physicians of another state." TEX. OCC. CODE § 160.007(c). Unlike section 160.007(d), section 160.007(c) does not limit the application of the exception to circumstances in which the medical peer review committee takes certain actions; the documents may be disclosed to the listed entities regardless of what the committee decides or the ultimate resolution of the underlying issue. *Id.* In section 160.007(d), however, the Legislature qualified the exception with specific language: "If a medical peer review committee takes action that could result in [discipline]...." *Id.* § 160.007(d). Clearly, in section 160.007(d), the Legislature intended for the medical peer review committee to take action beyond simply convening a meeting for the exception to apply.

█ Interpreting section 160.007(d) to allow an exception to the privilege every time a medical peer review committee reviews a physician's actions would ignore the Legislature's specific language in section 160.007(d) and render the medical peer review committee privilege meaningless. "We must not interpret the statute 'in a manner that renders any part of the statute meaningless or superfluous.'" *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex.2014) (quoting *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008)). Dr. Franklin's interpretation of the statute would require disclosure of the medical peer review committee's records every time the committee conducts a review, regardless of outcome. Under this interpretation, it is difficult to conceive of an instance where the physician would not be entitled to the documents and the documents would remain privileged. This would in turn enfeeble confidentiality and prevent physicians from engaging in can-

did and uninhibited communications, which is essential for improving the standard of medical care in the state. *See McCown*, 927 S.W.2d at 3; *Brooks*, 927 S.W.2d at 17. "Nothing is worse than a half-hearted privilege; it becomes a game of semantics that leaves parties twisting in the wind while lawyers determine its scope." *Brooks*, 927 S.W.2d at 17. We reject Dr. Franklin's interpretation. For the exception in section 160.007(d) to apply, the medical peer review committee must have taken some action that could have resulted in discipline beyond simply convening to review the physician's actions. On the mandamus record before us, however, we cannot determine whether the medical peer review committee in this case took action that could have resulted in discipline.

According to Dr. Franklin's deposition, he met with a three-member medical peer review committee several weeks after the failed surgery and gave a verbal report of the incident. During the meeting, he told the committee that he had difficulty performing the surgery because of complications resulting from an abundance of scarred tissue, which made distinguishing between thymus and thyroid tissue difficult. Because the cryostat machine was unavailable, he could not definitively diagnose the removed tissue, so he ended the surgery. Dr. Franklin testified that the committee concluded during the meeting that his actions during surgery were rea-sonable and valid, and the committee decided to take no further action.

According to Christus's counsel at oral argument, after the medical peer review committee reviewed the case, it decided to take no further action and closed the file without a report to the Medical Executive Committee (MEC).[9] Dr. Franklin's counsel, however, contends that the committee took action and cleared Dr. Franklin of any wrongdoing.[10] Under the Bylaws, when considering whether routine corrective action is necessary, a medical peer review committee may call the physician in for an interview before making a formal request for corrective action.[11] When a formal request for corrective action is made in writing to the MEC, the MEC will review the request and decide if an investigation is necessary. If the MEC decides to investigate, it will either conduct the investigation itself or appoint a subcommittee, special committee, or department to conduct the investigation. After the investigation, the investigating committee must submit a written report to the MEC, explaining reasons for or against corrective action. At that point, the MEC will make a recommendation to Christus's Medical Board, which then decides whether to take corrective action.[12]

It appears from the record and counsel's arguments that Dr. Franklin was called in

9. The MEC is the governing body in each facility in Christus's network of hospitals, and each facility is governed by its own MEC.

10. Counsel at oral argument disagreed about whether there could be any action after a medical peer review committee closes a file. Christus's counsel says no—no report to the MEC, no discipline. Dr. Franklin's counsel says maybe—she assumes there could be discipline despite a medical peer review committee clearing a doctor of wrongdoing (though she acknowledges that there is no evidence of this in the record).

11. Routine corrective action is necessary under the Bylaws when a physician engages in conduct that (1) is likely to be detrimental to patient safety, (2) violates the Bylaws or professional standards of practice or conduct, or (3) violates any medical staff policies relative to professional conduct and/or physician or practitioner health.

12. Christus's Medical Board is the body that oversees all of the MECs for the entire Christus hospital system.

for an interview by the medical peer review committee, not an investigation following a formal written request for corrective action. According to Dr. Franklin's deposition testimony, he met with the medical peer review committee because the circumstances of the failed surgery "generated a sitdown, so to speak." Under the Bylaws, "[b]efore corrective action is formally requested against a Physician . . ., the individual or Committee authorized to request corrective action may afford the Physician . . . an interview, at which the circumstances prompting consideration of corrective action are discussed and the Physician . . . is permitted to present relevant information in his/her own behalf."[13] At the "sitdown" with the medical peer review committee, Dr. Franklin was given the opportunity to present his oral report on the circumstances of the surgery and discuss it with the committee.

After the interview, the medical peer review committee likely prepared a "case review form." Dr. Franklin testified that he had been a member of the medical peer review committee in the past and that the committee normally fills out a form and assigns the case a level. While we do not have a copy of the case review form at issue in this case, the sealed documents contain a case review form and letter from the medical peer review committee's review of a case involving a different patient not at issue here. That form indicates that the committee can recommend four levels of action. Under Level 1, the committee can decide that the quality of care was satisfactory and that no further action is required. Under Level 2, the committee can refer the case to the "responsible physician" to consider "improvement opportunities" because the quality of care needs

improvement. If the committee recommends Level 3, then the quality of care is of "significant concern" and the case will be referred to the "responsible physician" for a written response. Finally, the committee can recommend Level 4 if the quality of care standard was not met, in which case the "responsible physician" will appear in person to discuss the case.

On the mandamus record before us, we cannot determine whether the medical peer review committee took any action that could have resulted in discipline, which would authorize disclosure of the final medical peer review report and recommendation to Dr. Franklin under section 160.007(d). Taking into account the mandamus record presented to us, including the Bylaws, and counsels' arguments, it appears that the file was closed after the medical peer review committee finished its review. According to Christus's counsel, no report or final decision was submitted to the MEC and no recommendation was made; the medical peer review committee simply closed the file. We cannot determine from this record whether the medical peer review committee made a recommendation or final decision required to trigger the exception under section 160.007(d). Even assuming that closing the file or completing a case review form specifying that no further action is necessary constitutes a recommendation or final decision, we are not convinced that the committee in this case could have recommended any of the disciplinary measures listed in section 160.007(d). Even under Level 4, the case review form in the record indicates that the committee can recommend only that the "responsible physician [ ] appear in person to discuss care." It appears from the Bylaws that the committee could then

---

13. The Bylaws state that "[c]orrective action must be requested in writing by an officer of the Medical Staff, a Medical Staff Committee,

a Department Chair/Section Chair, or the facility Administrator."

formally request corrective action. But the mandamus record contains no evidence of any such request. In fact, the mandamus record suggests that the medical peer review committee likely identified Dr. Franklin's case as Level 1, under which no further action is necessary. On the record before us, we cannot conclude that the exception in section 160.007(d) applies. A thorough review of the peer review file tendered for in camera inspection is critical to the evaluation of Christus's claim of privilege and the question of whether Dr. Franklin met his burden to prove that the section 160.007(d) exception applies. *See In re Living Ctrs.*, 175 S.W.3d at 261. The trial court clearly abused its discretion in failing to adequately review the merits of the documents to determine whether the privilege applied and, if so, whether the exception in section 160.007(d) was satisfied, before ordering production.[14] *See id.* at 261–62.

The trial court must review the allegedly privileged medical peer review documents and the evidence presented to determine whether, upon further review, Dr. Frank-

lin has established that an exception to the medical peer review privilege applies.[15] *See In re E.I. DuPont de Nemours*, 136 S.W.3d at 223; *In re Park Cities Bank*, 409 S.W.3d at 868–69. Specifically, the trial court must consider whether the medical peer review committee performed some voluntary act of will from which a consequence—the disciplinary measures listed in the statute—was possible. If Dr. Franklin did not meet his burden, then the trial court must withdraw the order compelling production and order that the medical peer review documents are not subject to disclosure under the exception. *See* TEX. OCC. CODE § 160.007(a).

We hold that the trial court did not adequately review the documents submitted for in camera inspection and such review is critical to the privilege issue in this case. *See In re Mem'l Hermann Hosp.*, 464 S.W.3d at 698 ("[T]he trial court must conduct an in camera inspection of [the] documents before deciding to compel production.") (alteration in original) (quoting *In re E.I. DuPont de Nemours*, 136 S.W.3d at 222). Therefore, the trial court

---

14. Dr. Franklin argues that because all of the records from the medical peer review committee's review could be disclosed to other medical peer review committees and the Texas Medical Board under section 160.007(c), which could ultimately result in the denial of privileges—a disciplinary measure listed in the statute—he is entitled to production of the medical peer review committee documents under section 160.007(d). *See* TEX. OCC. CODE § 160.007(c). Dr. Franklin suggests that the trial court may have determined that such disclosure could result in disciplinary measures, based on his in camera inspection of the documents at issue. The trial court, however, "didn't look at the [medical peer review] report for the merits of it one way or the other." The trial court admitted that he "didn't look ... closely enough" to determine whether disclosure of the report "could result" in discipline because "that wasn't the reason [he] was looking at it." Moreover, the record contains no indication of any actual disclo-

sure under section 160.007(c). We cannot determine on this record whether potential disclosure of Dr. Franklin's medical peer review committee records under section 160.007(c) could entitle Dr. Franklin to production of the committee's final recommendation and decision under section 160.007(d).

15. We recognize that in some cases, the documents themselves will be sufficient to prove whether the medical peer review committee took action that could result in discipline. *See In re E.I. DuPont de Nemours*, 136 S.W.3d at 223 ("The documents themselves may constitute sufficient evidence to make a prima facie showing. . . . "). In those cases, the trial court, through an in camera inspection, could determine whether the situation satisfies the exception without additional evidence. In this case, however, the trial court did not properly inspect the documents to determine whether the exception applies.

abused its discretion in ordering that the medical peer review documents be disclosed. *See id.* at 715–16 (holding that the trial court abused its discretion in compelling production of documents protected by the medical peer review committee privilege); *In re Living Ctrs.*, 175 S.W.3d at 256 ("Since the documents at issue are alleged to be privileged, mandamus is appropriate if we conclude that they are privileged and have been improperly ordered disclosed.").

Because the trial court improperly ordered that privileged documents be disclosed, Christus has no adequate remedy by appeal. *See In re Living Ctrs.*, 175 S.W.3d at 255–56. Therefore, mandamus relief is appropriate. *Id.*

## IV. Conclusion

The trial court abused its discretion in failing to adequately review the allegedly privileged documents before ordering production. We hold that Christus's medical peer review committee records should not have been ordered produced without a proper in camera inspection to review the merits of the documents and determine whether the exception in section 160.007(d) applies. Because Christus is without adequate appellate remedy, mandamus relief is appropriate. We direct the trial court to vacate the parts of its August 19, 2014 order that compel production of the medical peer review committee records at issue here and determine whether, upon further examination, the section 160.007(d) exception to the medical peer review privilege applies in this case. We are certain that the trial court will comply. Our writ will issue only if it fails to do so.